### Kerry Coal Company v. Department of Environmental Resources

*Bruno Muscatello,* for Kerry Coal Company.
*Stanley R. Geary,* for the Department of Environmental Resources.

MAZULLO and GERJUOY, *Member,* June 4, 1984—On May 3, 1982, the Department of Envi-

ronmental Resources (DER) assessed a civil penalty of $7000 against the Kerry Coal Company (KCC) for allegedly "conducting surface mining, including blasting, on approximately a five (5) acre area on or about September 21, 1981, without having first obtained the necessary permits and approvals from the Department", pursuant to the Surface Mining Conservation and Reclamation Act, Act of May 31, 1945, P.L. 1198, as amended, 52 P.S. §1396.1 et seq. (SMCRA).

KCC timely appealed this assessment, and a hearing on the merits was held on October 4, 1983. Post-hearing briefs were filed by DER and KCC on December 1, 1983 and January 23, 1984, respectively. On January 26, 1984, the file on this matter was delivered to the board-appointed hearing examiner, Mr. Baurer, for adjudication. 71 P.S. §510-21 (e).

## FINDINGS OF FACT

1. Appellant is the Kerry Coal Company, a Pennsylvania Corporation having a business address of R. D. no. 2, Box 19, Portersville, Pa., 16051, and whose business includes the mining of coal by the surface mining method.

2. Appellee is the Commonwealth of Pennsylvania, Department of Environmental Resources (DER), with offices located on the seventh floor, Fulton Bank Building, P. O. Box 2063, Harrisburg, Pa., 17120, and is the agency empowered to enforce the provisions of the Surface Mining Conservation and Reclamation Act, Act of May 31, 1945, P.L. 1198, as amended, 52 P.S. §1396.1 et seq.; the Clean Streams Law, Act of June 22, 1937, P.L. 1987, as amended, 35 P.S. §691.1 et seq.; and the Rules and Regulations promulgated thereunder.

3. An additional party involved in and having an interest in this matter is Kerry Brothers, a partnership having a business address of R. D. no. 2, Portersville, Pa., 16051, and whose business includes dealings in real estate, various types of construction equipment, and construction work. Mr. Vernon Kerry, President of KCC, is a partner in KB.

4. On October 5, 1979, KB entered into a royalty agreement whereby it acquired the right, subject to applicable legal requirements and restrictions, to mine coal by the surface mining method on properties owned by and located in the vicinity of the Concord United Methodist Church (the Church) of North Sewickley Township, Beaver County, Pa. This agreement also required KB to enlarge the Church's parking lot, and to construct a ballfield and an outdoor amphitheater.

5. On January 15, 1980, KB assigned its Coal Lease under the aforesaid royalty agreement to KCC; although the assignment included both mining and construction activities as set forth in Finding of Fact no. 4, supra, there was testimony that KB continued to be active in some of the construction work called for under the lease.

6. On or about November 14, 1980, KCC submitted an application to DER for a Special Reclamation Project Permit for the operation which is the subject of the instant appeal, the location of which has been set forth hereinabove at Finding no. 4.

7. In September of 1981, surface mine operators were normally required to obtain a mining permit pursuant to Section 4(a) of the SMCRA, 52 P.S. §1396.4(a), and a mine drainage permit pursuant to Section 315(a) of the CSL, 35 P.S. §691.315(a). However, in some cases where an operator proposed to conduct surface mining of coal incidental to reclamation of abandoned areas previously affected by

surface mining or incidental to construction activities, the operator could apply for and receive a Special Reclamation Project Permit, which would be issued pursuant to both acts.

8. In September of 1981, a surface mining operator could not begin mining operations at a site until he actually received the necessary permits from DER. Mere application for the permits was insufficient to authorize mining.

9. The Church wanted the new parking lot expansion completed as soon as possible, but KB, acting as agent for KCC, delayed in doing so until approximately September of 1981, so as to avoid having to move substantially the same equipment into the North Sewickley operational area more than once.

10. Fill for the parking lot was intended to come from an area located a few miles to the north, and on the other side of a road (Pleasantview Street) from the Church structure and the existing parking lot. This area was within the boundaries of the property which the Church had leased for surface mining of coal.

11. On or before September 8 or 9, 1981, trees and brush were cleared from the area from which the parking lot fill material was to come.

12. On September 15, 1981, KCC conducted a blasting of the overburden of a portion of a pre-existing highwall at the aforesaid site, from which parking lot fill material was to come, within the North Sewickley operational area.

13. According to the uncontroverted testimony of Vernon Kerry, he had consulted with J. Anthony Ercole, Director of DER's Bureau of Mining and Reclamation, prior to the aforesaid blasting, to ascertain whether a permit might be required for this purpose. Mr. Kerry testified that Mr. Ercole had ad-

vised him only to keep a log of the blast, which was, in fact, done.

14. On September 21, 1981, DER's inspectors inspected KCC's North Sewickley operational area.

15. On September 21, 1981, none of the permits described hereinabove at Finding no. 7 had yet been issued to KCC.

16. On September 21, 1981, access to the North Sewickley operational area could be had by a road characterized by DER as a "haul road" and by KCC as a clay or dirt road having insufficient foundation to support coal trucks. This road entered the property which is the subject of this appeal in an easterly direction from a public road designated as "Township Road 562".

17. On September 21, 1981, at the point where the "haul road" intersected "Township Road 562", there stood an identification sign of a type normally posted at surface mining sites in accordance with DER Regulations, specifically 25 Pa. Code §87.92 (a) as presently designated, but as of the date stated above, 25 Pa. Code §77.92 (b) (1). This sign carried the name, address and telephone number of KCC, plus its License Number, a Surface Reclamation Project Permit number, and a Federal Identification Number.

18. On September 21, 1981, a dozer operator was shoving the rock which had been blasted on September 15, and which was later identified as primarily sandstone, toward the north and northwest, i.e., in the opposite direction from the Church structure.

19. On September 21, 1981, there was an additional area adjacent to the area which had been blasted on September 15, which additional area had been cleared and drilled for blasting.

20. By September 21, 1981, approximately 20 feet of the overburden material from the area which had been blasted on September 15 had been removed.

21. On September 21, 1981 a loader operator was working in an area other than the area which had been blasted on September 15, and was digging shale for the parking lot for the Church.

22. On September 21, 1981, KCC was ordered by DER to cease all mining and blasting at the North Sewickley operational site until the necessary permits and approvals would be obtained from DER.

23. On September 21, 1981, certain actions necessary to prepare the area for mining had not been taken; these included, in addition to the failure to provide a foundation in the "haul road" sufficient to support coal trucks (as noted hereinabove at Finding no. 16), failure to construct a bench or to install treatment or sedimentation ponds.

24. Conflicting expert testimony was recorded, as to whether the September 15, 1981 blast was or was not sufficient to allow the mining of the coal seam located beneath the blasted area, and as to whether the manner of blasting was or was not typical of normal surface coal mining practices.

25. Testimony to the effect that the explosive used in the September 15, 1981 blast (so-called 4 x 5 primers) was inferior, for mining purposes, to ammonium nitrate, which was not used, was not contradicted.

26. On September 21, 1981, no coal had been exposed as a result of the September 15 blast, nor had any coal been removed from the site.

27. On October 8, 1981, Special Reclamation Project Permit no. SRP 04800902 was issued to KCC, covering its operations at the North Sewickley site. This was the same number posted on the sign described hereinabove at Finding no. 17.

28. Conflicting testimony regarding the acreage affected by KCC's activities at the North Sewickley operational site prior to September 21, 1981 was to

the effect that the amount was either at least five acres or just one and one-half acres.

29. After October 8, 1981, KCC mined the North Sewickley area covered by the permit which it received on that date.

30. Subsequent construction of the Church's parking lot was completed, using shale (see Finding no. 21 above); whether or not sandstone was also used (see Finding no. 18 above) was not definitely established.

31. Prior to September 21, 1981, KCC knew that permits were required, as set forth hereinabove at Finding no. 7, in order for it to commence mining activities at the North Sewickley site; KCC knew also that it had not yet received such permits.

32. In September of 1981, when the activities in issue occurred, and in May of 1982, when DER assessed the civil penalty against KCC, there were no regulations in effect covering the amount or manner of computation of civil penalties for unpermitted mining.

33. On November 5, 1981, a memorandum entitled "Penalties/Off Permits" was issued by J. Anthony Ercole, Director of DER's Bureau of Mining and Reclamation. This document set forth a set of guidelines pending the issuance of appropriate regulations, on the basis of which penalties might be

34. In establishing its civil penalty guidelines, DER considered the criteria set forth in 35 P.S. §691.605(b) and 52 P.S. §1396.22, including as relevant factors: willfulness, seriousness, deterrent effect, cost of reclamation, and harm to the environment.

35. Application of the civil penalty guidelines to the facts of the instant case resulted in a civil penalty assessment of $7000. This was the amount assessed against KCC on May 3, 1982.

36. Under the presently effective civil penalty regulations (25 Pa. Code §§86.153 and 86.194), the minimum civil penalty assessment against KCC, assuming its activities prior to September 21, 1981 did in fact constitute unpermitted mining and assuming the affected area to have been five (5) acres, would be greater than the amount actually assessed, namely, either $9000 or $10,000, depending on whether the one-acre area of the "haul road" was to be considered as an area of "mining activity" or of "mining", respectively.

## DISCUSSION

### A. The Issues

Two principal issues, and one subsidiary matter, present themselves for consideration in adjudicating this appeal:

(1) Did the activity complained of, viz., the blasting of overburden on September 15, 1981, constitute unpermitted mining or was it merely an unregulated removal of surface rock to be used in the construction of a parking lot?

(2) Did DER act reasonably in determining to assess a civil penalty and in computing the amount thereof as it did, or was DER's action in this regard arbitrary and an abuse of discretion? (A corollary to this question is the conclusion that, if the blasting activity of September 15, 1981 was merely an unregulated removal of surface rock, and/or if DER's action in assessing a civil penalty was arbitrary and an abuse of discretion, then any inquiry regarding the propriety or amount of the said penalty would appear to be mooted a priori.)

(3) A third and lesser issue is whether it was in fact KCC or KB that conducted the blasting activity on September 15, 1981. (Here again it follows that,

if the blasting activity of September 15, 1981 was merely an unregulated removal of surface rock, and/or if DER's action in assessing a civil penalty was arbitrary and an abuse of discretion, then any inquiry as to which corporate entity actually conducted the activity is apparently moot as well.)

In order to preserve the opinions of this board as to each of the issues, whether or not mooted, against the possibility of future appeals, we shall consider them in reverse order.

### B. Which Corporate Entity Conducted the Blasting?

Appellant KCC argued, in its Pre-Hearing Memorandum, that "(a) separate company (KB) had made an agreement to build a parking lot . . ." and that "(t)he actions complained of . . . were not done by (KCC), but were done by (KB) . . . to build the parking lot and not to conduct mining operations."

Subsequently, argument by opposing counsel at the hearing revealed a certain discrepancy of recollection as to whether or not counsel had agreed, during an earlier telephone conference among themselves and the examiner, that the matter would even be raised as an issue. The examiner, while admitting to his own uncertainty on this point, stressed that, the matter having been omitted from the pre-hearing stipulations (Board Exhibit no. 1), it might therefore reasonably be expected to be omitted from argument as well, although he was not inclined to bar such course of later cross-examination of Mr. Kerry, who testified as follows:

"Q. Is it normal for Kerry Brothers to assign leases that they obtain for mining to Kerry Coal Company?

A. We assign leases to — Yes, we assign leases to Kerry Coal Company.

Q. When you assign a lease from Kerry Brothers to Kerry Coal Company, do you assign with that the obligation to pay the royalties that are incurred under the lease?

A. In most cases, Kerry Brothers continues to pay the royalties.

Q. In this particular case isn't it true that the assignment of the lease assigned all the obligations under the lease from Kerry Brothers to Kerry Coal Company, including the obligations to build the parking lot and amphitheater, et cetera?

A. I don't recall.

Q. But this document is an assignment of that particular lease. DER Exhibit 6 is an assignment of the lease which was introduced as Appellant's Exhibit 2. Is that correct?

A. Yes."

Our examination of the two exhibits alluded to in the concluding part of this exchange makes it clear that appellant's Exhibit no. 2, the leasing agreement between KB and the Church, distinctly tied together the two aspects of the agreement, mining and construction, in its penultimate two paragraphs, at page 8 thereof:

"This agreement can not be assigned, except to KERRY COAL COMPANY, R.D. #3, ROUTE 19, PORTERSVILLE, PENNSYLVANIA 16051, without written consent of the parties of the first part (i.e., the Church).

This agreement and all terms, covenants and conditions herein contained shall be binding upon and inure to the benefit of the parties of the first and second part, their heirs, executors, administrators, successors *or assigns*." (Emphasis added.)

Nowhere in the document was any provision made for its *partial* assignment. Thus the lease according to its own terms made it impossible to separate the

mining and construction responsibilities therein set forth, as between KB and KCC. DER Exhibit no. 6, KB's assignment of the leasing agreement to KCC, made no pretense of doing otherwise.

Finally, as DER's Post-Hearing Brief correctly pointed out, "(u)nless an assignment is qualified in some way it transfers the *whole* interest of the assignor. In re Purnam's Estate, 358 Pa. 187, 56 A.2d 86 (1948)." (At 25) (Emphasis added). No such qualification appears in the assignment comprising DER Exhibit no. 6.

We find, therefore, that the blasting operation of September 15, 1981 was conducted by KCC and not by KB, under the applicable lease and assignment. We hold, moreover, that any and all activities in pursuance of the objectives stated in the lease became the sole responsibility of KCC upon the execution of the assignment on January 15, 1980, and that any role KB may have played with respect to the subsequent achievement of the stated objectives was necessarily as an agent for KCC.

## C. Did DER Act Reasonably, or Did It Act Arbitrarily and Abuse Its Discretion, in Determining to Assess a Civil Penalty Against KCC, and in Determining the Amount of the Civil Penalty?

This issue arises primarily because of the facts recited in Findings no. 32 and no. 33, i.e., that the asserted violation occurred at a time when no regulations had yet been promulgated covering the determination of either the amount or manner of computation of civil penalties for unpermitted mining, and that pending the issuance of such regulations DER produced a set of guidelines for computing penalties, more than six weeks *after* having ordered

the cessation of all activities at the North Sewickley site.

The board has recently addressed the identical issue in the case of Western Hickory Coal Company v. DER, EHB Docket no. 82-141-G (issued June 2, 1983). There, although the fact pattern was different, the violation alleged, unpermitted surface mining of coal, was the same, and the time frame was virtually identical, the violation having assertedly occurred on September 11, 1981 and the civil penalty having been assessed on May 3, 1982, based on the same guidelines as in the instant case.

The principal difference between the two cases is that in Western Hickory the asserted violation involved unpermitted surface mining beyond previously permitted boundaries. As a result, application of the civil penalty guidelines in Western Hickory was predicated primarily on the element of willfulness of the appellant's errant behavior, willfulness being one of five criteria upon which those guidelines were based. Finding of Fact no. 34, supra, lists the other four as seriousness, deterrent effect, cost of reclamation, and harm to the environment. In the instant case, DER also has based its determination of the appropriateness and amount of the civil penalty on the asserted willfulness of KCC's behavior, pointing particularly to KCC's having known, on September 15, 1981, of the requirement for permits, and to KCC's lack thereof on that date. (Findings of Fact nos. 7, 8 and 31 supra; DER Post-Hearing Brief at 21, 23.) If we agree with DER that KCC was mining (see the discussion infra), we scarcely can disagree with the conclusion that KCC's action constituted willful violations of the law.

Furthermore, DER argues, it has sought in this instance to bring about the deterrent effect which

was another objective of the guidelines. Additionally, DER urges consideration of the relevant statutes, which both provide in identical language that:

"If the violation leads to the issuance of a cessation order, a civil penalty shall be assessed." CSL, 35 P.S. §691.605(b); SMCRA, 52 P.S. §1396.22. Moreover, as DER correctly points out, these same sections of law also provide that civil penalties of this type may even be assessed without regard to the factor of willfulness.

Finally, DER maintains that since it had considered all the statutory factors in both the formulation and application of the guidelines, and since the amount assessed under the guidelines was less than the minimum which would have resulted from application of the regulations adopted later (see Findings of Fact nos. 35 and 36, supra), its determination of the amount of civil penalty to be assessed was reasonable. Therefore, DER concludes that, absent any arbitrary action or abuse of discretion on DER's part, the board may not review the aforesaid application of the guidelines and determination of the civil penalty in favor of any standard or determination of its own. Appellant KCC insists, however, that such arbitrariness and abuse of discretion did indeed characterize DER's actions in this case. Hence KCC requests that if the board finds that unpermitted mining did take place on September 15, 1981 at the North Sewickley site, it should make its own independent review of the facts and redetermine the penalty based on its own application of the statutory criteria.

As we stated above, this case is virtually on point with that of Western Hickory, supra, especially as to the civil penalty guidelines issue. Consequently, inasmuch as the line of argument posited by DER in the instant matter is exactly in accord with our

own holding as to this issue in Western Hickory, we are constrained to adhere to our previous position, even though Western Hickory is presently up on appeal to the Commonwealth Court (at no. 1735 C.D. of 1983) on the same issue. The key factor pointing to the reasonableness of the penalty, once it is agreed that KCC acted willfully, is the same as in Western Hickory, supra: the amount DER assessed actually was less than would be authorized on the basis of presently promulgated regulations.

We therefore hold that, if the blasting activity of September 15, 1981 at the North Sewickley site constituted unpermitted mining, a determination we shall shortly address infra, then DER acted reasonably and not arbitrarily, and did not abuse its discretion, in determining to assess a civil penalty against KCC and in arriving at the amount of that penalty.

### D. Did the Blasting Activity of September 15, 1981 at the North Sewickley Site Constitute Unpermitted Mining, or was it Merely Unregulated Rock Removal?

DER has been at some pains, in its Post-Hearing Brief (at 12-14), to recite statutory definitions from SMCRA, CSL and the Pennsylvania Code, in all three of which certain preparatory work, impliedly inclusive of blasting and preparations for blasting, is explicitly set forth as comprising a part of the meaning of "surface mining". There is no doubt that under appropriate circumstances the activities which are the subject of this appeal, including not only the blasting itself but certain steps ancillary thereto, e.g., clearing, drilling, and overburden removal, could fit within the various definitions.

However, the definition of "surface mining" in 52 P.S. §1396.3 contains the proviso:

"Surface mining" shall not include (i) the extraction of minerals (other than anthracite and bituminous coal) by a landowner for his own noncommercial use from land owned or leased by him; or (ii) the extraction of sand, gravel, rock, stone, earth or fill from borrow pits for highway construction purposes, so long as such work is performed under a bond, contract and specifications which substantially provide for and require reclamation of the area affected in the manner provided by this act; nor (iii) the handling, processing or storage of slag on the premises of a manufacturer as a part of the manufacturing process."

This proviso shows the legislature recognized that not all extraction activities of sand, gravel, rock, etc., take place in association with "surface mining"; such extraction activities may be associated with, e.g., highway construction. In 52 P.S. §1396.3, the definition of surface mining preceding the just-quoted proviso clearly limits preparatory blasting falling under the SMCRA for "surface activity *connected with* surface or underground mining" (Emphasis added). In other words, the issue before us (as both parties recognized) is whether the activities for which KCC was penalized were sufficiently "connected with" surface mining to warrant classification as surface mining under the SMCRA's definition.

KCC conducted the blasting only after consultation with competent DER authority (Finding of Fact no. 13), and then complied fully with his suggestion that a log of the blast be kept (DER Exhibit no. 4). Moreover, even though there was expert disagreement in testimony regarding the sufficiency of some of the blast parameters to allow mining, and as

to the typicality of the manner of blasting when compared to normal mining practice (Finding of Fact no. 24), the use of 4 x 5 primers, an inferior explosive for surface mining purposes, rather than ammonium nitrate, which is preferred for such uses, was undisputed (Finding of Fact no. 25), and was in fact duly recorded in the aforesaid log or Blasting Record (supra).

Most important, perhaps, were the actions not taken, the effects not observed, in connection with the blast, but which would have been consistent with surface mining activities. As KCC has convincingly argued,

"neither (DER) inspector testified that any coal had been exposed by the blasting; neither one testified that any coal had been removed following the blast that had taken place at least six (6) days before the inspection; and, finally, no action was observed to prepare the area for actual mining. There was no testimony of a haul road being constructed that would support coal trucks, there was no bench constructed, and finally, no treatment or sedimentation ponds were installed."

As against these facts, DER urges us to consider KCC's stated desire to avoid having to move its heavy equipment to the site solely for the purpose of constructing the parking lot; the erection of the sign at the entry point to the site (Finding of Fact no. 17; DER Exhibit no. 2); uncertainties as to whether or not the sandstone blasted on September 15, 1981 had in fact wound up as fill for the parking lot; and testimony regarding various other activities which could as readily and circumstantially have been linked to the parking lot construction, or even one of the lesser contractual objectives, e.g. construction of a ballfield and amphitheater, as to the alleged violation; (Board Exhibit no. 1), but which were never actually tied to any of these.

Neither the appellant's economies in the allocation and siting of its heavy equipment, nor its anticipatory erection of a sign, nor the indeterminator of the fate of a quantity of sandstone, nor the other activities cited, all of which are certainly capable of supporting DER's allegations, are sufficiently probative of, or linked with sufficient proximateness to, those allegations, even collectively, to enable DER to overcome KCC's arguments in defense of its activities at the North Sewickley site prior to and including September 21, 1981.

DER has the burden of proof in this civil penalty assessment appeal (Western Hickory), and we find the evidence supporting DER's position in this matter to be, in the main, circumstantial, insufficiently probative of the violation charged, and hence inconclusive, arbitrary, and an abuse of discretion.

We therefore hold that DER has failed to show by a preponderance of the evidence that KCC was, at the time and place cited, engaged in unpermitted surface mining of coal; that DER thus has not met its burden of proof; and consequently the civil penalty imposed against KCC on May 3, 1982 was an abuse of discretion and should be rescinded.

## E. Conclusion

We have found DER's action in assessing a civil penalty against KCC in the instant matter to have been unjustified on the basis of the evidence adduced, inasmuch as the said evidence was insufficient to allow DER to carry its burden of proof of the violation with which KCC was charged.

We have also held that, had we been able to sustain the charge and the assessment, both the manner of imposition and the computation of the amount of the said assessment would have been, in

our view, reflective of reasonable action, neither arbitrary nor an abuse of discretion, on the part of DER.

Finally, we have found that the blasting operation which forms the subject matter of this appeal was conducted by KCC and not by KB; any role KB may have played in the matter after January 15, 1980 was undertaken as an agent for KCC.

## CONCLUSIONS OF LAW

1. This board has jurisdiction over the parties and the subject matter of this appeal.

2. The SMCRA, CSL, and pertinent regulations prohibiting surface mining of coal without a permit were in effect on September 15, 1981 when the activities which DER asserted as comprising unpermitted surface mining of coal occurred.

3. The board's purpose in this adjudication is to determine whether DER committed an abuse of discretion or an arbitrary exercise of its duties and powers in assessing a civil penalty against KCC on May 3, 1982, for having conducted surface mining without a permit.

4. The burden of proof of the facts underlying the assessment of a civil penalty in this appeal lies with DER.

5. DER has failed to show by a preponderance of the evidence that KCC was, at the time and place cited, engaged in unpermitted surface mining of coal; hence DER has not carried its burden of proof in this matter.

6. Had DER been able to show that KCC had been mining without a permit, its assessment of a civil penalty would have been reasonable and neither arbitrary nor an abuse of discretion, both as to propriety and as to amount thereof.

7. Under both SMCRA and CSL, DER had a mandatory duty to assess a civil penalty against KCC, once DER had issued its cessation order against KCC and had concluded the order was justified by KCC's violations.

8. The activities complained of as assertedly in violation of the applicable laws and regulations were conducted by, and were the responsibility of KCC exclusively, from January 15, 1980 until at least those dates pertinent to this case.

## ORDER

Wherefore, this June 4, 1984, this appeal as above captioned is sustained, and it is ordered that the assessment of $7000 as civil penalty imposed upon the appellant be forthwith rescinded, and it is further ordered that the cessation order against appellant be forthwith reversed.